IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MH, TB; *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEX J. ADAMS, in his official capacity as the Director of Idaho Department of Health and Welfare<br><br>*Defendants*,<br><br>v.<br><br>WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH<br><br>*Third-Party Subpoena Recipient*. | Case No. |

## MOTION OF NONPARTY WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH TO QUASH SUBPOENA

**I.      INTRODUCTION**

Illinois' recently enacted "Shield Law," known as the Lawful Healthcare Activity Act ("LHCA Act"), protects medical professionals in Illinois from out-of-state subpoenas, just like this one, related to lawful healthcare activity. The Shield Law bars the subpoena at issue here (the "Subpoena"), issued by Idaho's Republican Attorney General (the "State"). The Subpoena is the latest attempt by several Republican State Attorneys General ("AGs") to attack groups that support trans people. The Shield Law requires quashing the Subpoena in its entirety. Moreover, black-letter constitutional principles prohibit subpoenas like this one that so transparently attempt to chill free speech and free association for a politically-disfavored group.

The World Professional Association for Transgender Health ("WPATH") is an Illinois non-profit organization dedicated to promoting evidence-based care, education, research, public policy, and respect

in transgender health which is under attack because politicians like the AGs misconstrue and mischaracterize what groups like WPATH do through the issuance of subpoenas like this one. Nearly half a dozen AGs have lodged overbroad, irrelevant, and unlawful third-party subpoenas and litigation against WPATH over the past several months. The nonparty subpoenas have collectively sought hundreds of categories of documents from WPATH, and contrary to the AGs arguments, the subpoenas are unrelated to each underlying litigation in which the AGs are defending their individual state's ban or limit on transgender healthcare. In fact, one court most recently described the third-party litigation brought by the AGs as "nonsensical."[1] This Subpoena, like the other third-party subpoenas and litigation by the AGs, is exactly the kind of "legal action from "reactionary state governments" anticipated by the Shield Law.

The Shield Law and constitutional law render the Subpoena unenforceable before even reaching the basic civil procedure rules governing third-party subpoenas, which require a subpoena, like this one, to be quashed when it seeks irrelevant documents, when it is overbroad, or when it imposes a disproportionate burden.

## II. BACKGROUND

### A. The Underlying Litigation

On September 29, 2022, two transgender residents of Idaho sued the Director of the Idaho Department of Health and Welfare, the Idaho Department of Health and Welfare, and the Medical Director of the Idaho Division of Medicaid to challenge Idaho's Medicaid policy which denies transgender individuals life-saving healthcare. Idaho's Medicaid policy excludes coverage for certain medically-necessary healthcare for transgender individuals to address significant distress caused by gender dysphoria. The suit seeks, among other things, injunctive and declaratory relief to bar the enforcement of

---

[1] *See* Ex. A, Order Dismissing Third-Party Complaint against WPATH in *Kalarchik, et al., v. State of Montana, et al.,* C.A. ADV-2024-261 (Mont. First Jud. Dist. Ct., Lewis and Clark Cty., Oct. 30, 2024).

the policy. *See MH and TB, individually, v. Jeppesen, et al.*, C.A. No. 22-409 (D. Idaho) (hereafter "Underlying Litigation").[2]

B. **Nonparty WPATH**

WPATH is a nonparty to the Underlying Litigation and the subject of the State's out-of-state Subpoena. WPATH is a 501(c)(3) non-profit professional and educational organization that has been devoted to transgender health for decades. *See* Declaration of WPATH ("WPATH Decl.") ¶ 5. Founded in 1979, WPATH's mission is to promote evidence-based care, education, research, public policy and respect in transgender health. *Id*. at ¶ 7. WPATH is an international membership organization, with regional affiliate organizations in Europe and the United States. *Id*. at ¶ 9. WPATH is internationally recognized as a leader in research and treatment for individuals with gender dysphoria. *Id*. at ¶ 8.

C. **The Subpoena**

On September 6, 2024, the State served the out-of-state Subpoena on WPATH.[3] *See* Ex. B. The Subpoena contains seventy (70) broad requests for a sprawling set of documents and information from WPATH. Specifically, the Subpoena seeks, among other things, all communications and documents relating to WPATH's research and drafting of dozens of publications; communications relating to internal personnel matters within WPATH and WPATH correspondence with its regional affiliates, governmental entities, and other groups; information about WPATH's activities and academic scholarship on gender-affirming care; and communications with counsel in the Underlying Litigation. The Subpoena should be quashed because its requests are barred by the Illinois Shield Law, infringe on WPATH's First Amendment Speech and Associational Rights, and because the requests are overbroad, not relevant to the Underlying Litigation, and disproportionately burden WPATH.

---

[2] The suit was recently amended to substitute the new Director of the Idaho Department of Health and Welfare, to name additional plaintiffs, and to challenge Idaho House Bill 668 (HB 668), a new state law prohibiting the use of state funds for any gender-affirming care and surgeries that are medically necessary for transgender individuals. HB 668 became effective on July 1, 2024.

[3] WPATH retained counsel to handle this matter on October 9, 2024.

### D. Meet-and-Confer Efforts

Counsel for WPATH reached out to the State to engage in good faith attempts to resolve the Subpoena as soon as it was retained by WPATH. *See* Declaration of Derick D. Dailey ("Dailey Decl."). During those discussions, WPATH explained its position that the Illinois Shield Law provides a wholesale bar to the Subpoena because it seeks documents and information related to WPATH's lawful healthcare activity. *Id.* at ¶ 6. WPATH also explained that the First Amendment prohibits many of the Subpoena's requests and that the Subpoena is overboard, irrelevant to the Underlying Litigation, and burdensome on WPATH. *Id.* ¶ 7. In response to WPATH, the State explained that it was entitled to the information sought in the Subpoena because some of the documents had been produced in other prior litigation. *Id.* ¶ 8. In fact, the State provided WPATH with a chart detailing which of its requests were the same as requests in other litigation and which were different. *Id.* On November 12, WPATH explained again that it believed the Subpoena was unenforceable because of the Shield Law and notified the State that it would seek to quash the Subpoena. *Id.* ¶ 9. This Motion to Quash ("Motion") ensued.

## III. ARGUMENT

### A. This Motion Belongs in this Court.

This Subpoena was issued from the District of Idaho. However, since WPATH is a nonparty located within the Northern District of Illinois, the Motion is properly filed here. Federal Rule 45(d)(3)(A) states that "the court for the district where compliance is required" is the appropriate venue for filing a motion to quash. For purposes of a motion to quash, the place of compliance is where the subpoenaed party is located. *See Raap v. Brier & Thorn, Inc.*, 2017 U.S. Dist. LEXIS 87004 (C.D. Ill. Jun. 7, 2017) (granting motion to quash and explaining that due to the purpose behind Rule 45, the place of compliance should be tied "to the location of the subpoenaed person or entity"); *see also York Holding, Ltd. V. Waid*, 345 F.R.D. 626 at *9 (Apr. 3, 2024) (explaining that "the place of compliance for the purposes of filing a motion to quash a subpoena seeking documents from a nonparty is the place where that nonparty is located"). This Court is therefore the appropriate court to decide this Motion.

B.     **Illinois' Shield Law Renders the Subpoena Unenforceable.**

Subpoenas issued pursuant to Rule 45 allows a court to quash a subpoena when it requires disclosure of privileged or other *protected matter*, when no exception or waiver applies. *See* Fed. R. Civ. P. 45(d)(3)(A)-(B); Fed. R. Civ. P. 45(d)(3)(A)(iii) (emphasis added). Federal courts recognize that "privacy interests and confidentiality concerns can factor into a decision whether to quash a subpoena under Rule 45, even though the information requested by the subpoena is not subject to a federal evidentiary privilege." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1336 (11th Cir. 2020) (explaining that when a citizen is assured a protection by a state statute, this promise should not be discarded lightly).

The Shield Law provides that a subpoena requesting documents or information related to lawful healthcare activity, as defined in the LHCA Act, is unenforceable unless an exemption applies.[4] *See* 735 ILCS 35/3.5(a). The State, with no notable exemption, seeks documents and information relating to WPATH's lawful healthcare activity. WPATH respectfully requests that the court quash this Subpoena, as the requests seek disclosure of "other protected matter." *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).

1.     **The Subpoena seeks documents and information related to lawful healthcare activity.**

The Subpoena's grossly overbroad requests fall squarely into the definition of "lawful healthcare activity" under the LHCA Act, which is defined as:

> the treatment of gender dysphoria or the affirmation of an individual's gender identity or gender expression, including, but not limited to, all supplies, care, and services of a medical, behavioral health, mental health, surgical, psychiatric, therapeutic, diagnostic, preventative, rehabilitative, or supportive nature that is not unlawful under the laws of this State, including on any theory of vicarious, joint, several, or conspiracy liability.

---

[4] 735 ILCS 35/3.5 states that a clerk of court shall issue a subpoena that requests information related to lawful health care activity if the subpoena relates to 1) an out-of-state action founded in tort, contract, or statute brought by the patient who has sought or received lawful health care or the patient's authorized legal representative for damages suffered by the patient or derived from loss of consortium of the patient, or 2) an out-of-state action founded in contract brought or sought to be enforced by a party with a contractual relationship with the individual whose documents or information are the subject of the subpoena. Neither of these exemptions apply in the Underlying Litigation.

5

*See* 735 ILCS 40/28-10.

The LHCA Act further defines "lawful health care activity" to mean "seeking, providing, receiving, assisting in seeking, providing, or receiving, providing material support for, or traveling to obtain lawful health care." *Id*.

In its Subpoena, the State has demanded invasive discovery into WPATH's lawful healthcare activity that can be grouped into the following categories: (1) requests relating to the Standards of Care for gender-affirming medical care that WPATH helps facilitate; (2) requests relating to certain WPATH academic scholarship that assist healthcare providers in treating gender dysphoria; (3) requests relating to the drafting of the International Classification of Diseases (ICD) coding for gender identity-related health; (4) requests relating to USPATH conferences and academic symposia that assist healthcare providers in learning about and treating gender dysphoria; (5) communications and documents between peer entities regarding gender dysphoria, related conditions, and transitioning for minors. *See* Ex. B.

This Subpoena clearly seeks documents and information related to WPATH's lawful healthcare activity since it seeks documents regarding the treatment of gender dysphoria. WPATH, a professional association that sets the standard of care for gender-affirming medical care, engages in lawful healthcare activity by "providing," "assisting in . . . providing," and "providing material support" for the treatment of gender dysphoria and gender affirming care by issuing clinical guidelines on the widely-accepted standard of care for gender dysphoria. *See* 735 ILCS 40/28-10; *see also* WPATH Decl. ¶¶ 7–8. The Subpoena thus requests information that is protected under the Shield Law.

  **2.  Illinois Enacted Its Shield Law to Bar Subpoenas Just Like This One.**

In overruling decades of abortion-rights jurisprudence, including the right to an abortion, in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Supreme Court also made clear that the power to regulate any aspect of reproductive healthcare not protected by federal law would be left to individual states. *Id*. In response to the Court's decision, nearly two dozen states took steps to protect the right and access to reproductive healthcare.

6

Illinois enacted sweeping new reproductive rights and gender-affirming care protections (HB 4664)—a bill that "protects health care providers and their patients from legal attacks by neighboring states and expands health care access and options across the state."[5] As Governor Pritzker noted when he signed the bill into law, the new law would "protect[] Illinois providers and their patients, thousands of whom have travelled to Illinois to access essential reproductive health care now banned in their home states." *Id*. The Governor's office explained that "many providers fear legal action from reactionary state governments from providing essential care," and that, in response, the law would "shield[] individuals from civil and criminal discovery from other states[.]" *Id*.

The Shield Law was created for this exact situation: to protect WPATH from "legal action from reactionary state governments." *Id*. Through the Subpoena, the State seeks information regarding lawful healthcare activity from WPATH, an Illinois nonprofit. Both the letter and the spirit of Illinois' Shield Law is to prevent states from targeting groups like WPATH with subpoenas like the one that has been served here. An Illinois court recently agreed that the Shield Law protects WPATH from reactionary governments by granting WPATH's motion to quash a subpoena in a separate case. *See* Court Order in *Noe, et. al., v. Parson, et. al.*, Case No. 2024-MR-3 (Kane Cty., Illinois) (attached as Ex. C). The Subpoena here seeks much of what was quashed in the aforementioned subpoena. Like the court in *Noe*, this Court too should find that the Shield Law requires quashing of the Subpoena.

    C.    **Enforcement of the Subpoena Would Infringe WPATH's First Amendment Speech and Associational Rights.**

This Court should also quash the Subpoena because it infringes on WPATH's First Amendment Speech and Associational rights. If WPATH were required to produce documents in response to this Subpoena, there would be a chilling effect on the internal exchange of ideas among WPATH members, stakeholders, and supporters. WPATH Decl. ¶¶ 9–12. Additionally, individuals such as medical,

---

[5] *See* Press Release, Gov. Pritzker Signs Sweeping Reproductive Rights Protections Into Law (Jan. 13, 2023), available at https://www.illinois.gov/news/press-release.25906.html, (last visited Nov. 19, 2024).

7

healthcare, and academic professionals would be discouraged from participating in WPATH activities and events, such as learning symposia, academic conferences, research surveys, book projects, and WPATH meetings. *Id*. Such disclosure of information would adversely impact WPATH's mission of furthering the understanding and treatment of gender dysphoria by providing opportunities for professionals from various sub-specialties to discuss research and treatment. Disclosure would impede WPATH and its members from engaging freely with one another without fear of reprisal or fear that their engagement may become the subject of public scrutiny from reactionary state governments with a history of targeting the trans community. *Id*.

Courts routinely quash subpoenas that infringe on protected speech and associational interests. *See, e.g.*, *City of Greenville v. Syngenta Crop Prot., Inc.*, No. 11-MC-10, 2011 WL 5118601, at *7–10 (C.D. Ill. Oct. 27, 2011) (quashing nonparty subpoenas that sought internal communications between the Association and a member on First Amendment associational privilege grounds because disclosure would chill organizational activity); *AFL-CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (applying First Amendment privilege where compelled disclosure of "detailed descriptions of training programs … seriously interferes with internal group operations and effectiveness"); *Apple Inc. v. Match Grp., Inc.*, No. 21-MC-80184-YGR (TSH), 2021 WL 3727067, at *8–9 (N.D. Cal. Aug. 19, 2021) (granting motion to quash requests for organization's internal documents on First Amendment grounds and explaining that individuals would not want to participate in organizations if they knew their internal communications would be turned over).

The First Amendment has historically provided broad protections for free rights of association. *See NAACP v. State of Ala. Ex rel. Patterson*, 357 U.S. 449, 460–63 (1958). The District Court for the Central District of Illinois opined that:

> The right of association is a basic constitutional freedom, that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. In view of the fundamental nature of the right to associate, governmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.

*See City of Greenville,* 2011 WL 5118601, at *5.

Under the First Amendment's associational privilege, organizations are protected from compelled disclosure that would "induce members to withdraw … and dissuade others from joining it because of fear of exposure[.]" *NAACP*, 357 U.S. at 463. Importantly, "[t]he First Amendment associational privilege emerges when a discovery request specifically asks for a list of a group's anonymous members, or requests any similar information that goes to the heart of an organization's associational activities, and such disclosure could arguably infringe upon associational rights." *See Anderson v. Hale*, No. 00 C 2021, 2001 WL 503045, at *3 (N.D. Ill. May 10, 2001) (granting a motion to quash as to information on anonymous internet account users to protect their right to remain anonymous) (citing *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1542 (11th Cir. 1985)). Moreover, the associational privilege extends to "the content of internal communications between members, employees, and agents of associations." *City of Greenville*, 2011 WL 5118601, at *6 (citing *Perry v. Schwarzenegger*, 591 F.3d 1147, 1162-63 (9th Cir. 2010)). "Sometimes disclosure of the identity of the members of the association will subject members to harassment and intimidation because the association advocates a controversial view." *Id.* (citing *NAACP*, 357 U.S. at 462). Simply put, the associational privilege applies if the disclosure would "affect adversely" the "members' [ability] to pursue their collective effort to foster beliefs" by either "induc[ing] members to withdraw from the [organization]" or "dissuad[ing] others from joining it." *NAACP*, 357 U.S. at 462–63.

A *prima facie* showing of First Amendment infringement requires the party to demonstrate that enforcement of the discovery requests will result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *City of Greenville,* 2011 WL 5118601, at *6 (*citing Perry*, 591 F.3d at 1160). Importantly, requests for confidential information about an organization's members have been barred under the First Amendment. *See In re Heartland Inst.*, No. 11 C 2240, 2011 WL 1839482, at *5 (N.D. Ill. May 13, 2011) (granting a motion to quash a third-party subpoena for

9

confidential donor information because the subpoena infringed on the First Amendment rights of the third party with a chilling effect).

Here, the State seeks confidential information from WPATH about its research, members, stakeholders, and others that is clearly protected by the First Amendment's associational privilege. *See* Ex. A, Requests Nos. 1, 4, 9, 12, 13, 15, 17, 18, 19, 22, 28, 29, 31, 33, 47-52, 57, 59-70. The release of this information to the public would have a chilling effect on the individuals and institutions that take part in the important work that WPATH does. The attached declaration from WPATH explains in detail how disclosure of the information sought by the State would chill the organization's associational rights. *See* WPATH Decl. ¶¶ 9–12. As the Declaration makes clear, and in light of an uptick in harsh rhetoric and political attacks lodged at the transgender community, WPATH's mission and work can easily be considered controversial. Importantly, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *See Perry*, 591 F.3d at 1159.

The State seeks internal communications that identify how members, nonmembers, professionals, and nonprofessionals participate in WPATH meetings, committees, and "in the drafting of SOC-8." *See* Ex. A, No. 47. The Subpoena also seeks the identities of "non-professional 'stakeholders' in the development and approval of SOC-8" and information about individual votes and voting processes for certain publications. *Id.*, Nos. 4, 12.

Additionally, the Subpoena seeks to compel the disclosure of thousands of comments and survey responses to internal draft documents (*Id.*, No. 9); WPATH funding sources (No. 13); WPATH internal employment and personnel matters (Nos. 15, 22, 28); all communications between WPATH and other medical and professional organizations about gender dysphoria (Nos. 17, 18, 19, 26, 33, 48-52, 57, 59-70); and scores of internal communications about WPATH activities (Nos. 36–42). Compelled disclosure of any of the above information would significantly chill WPATH's activities. WPATH Decl. ¶ 11-13.

The WPATH Declaration further demonstrates how subpoenas like the State's Subpoena has already discouraged dialogue at WPATH. *See id*. For example, WPATH staff has been more cautious about sending written communications out of fear that these communications will be produced and taken out of context in an attempt to misuse and harm the persons WPATH is trying to help. WPATH Decl. ¶ 12-14. The Subpoena should be quashed on free association grounds because "there is some probability that disclosure will lead to reprisal or harassment." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981). WPATH's (and WPATH's members') right to freely associate is a "constitutional right [that] cannot be trumped by fishing expeditions or untenable assertions that the information sought is highly relevant to the litigation." *In re Heartland Inst.*, 2011 WL 1839482, at *5. That is precisely what the State is attempting to do here.

    **D.**    **The Subpoena Seeks Discovery Irrelevant to the Underlying Litigation.**

This Subpoena is not enforceable because it is irrelevant to the claims in the Underlying Litigation. *See* Fed. R. Civ. P. 26(b)(1) (discovery is allowed to the extent it is "relevant to [a] party's claim or defense"). Evidence is relevant when it tends to make a fact of consequence to the inquiry more or less probable than it would be without the evidence. *See* Rule 401. The Court has "broad discretion to assess the relevancy of proffered evidence." *United States v. Wilburn*, 581 F.3d 618, 624 (7th Cir. 2009) (citing *United States v. Fuesting,* 845 F.2d 664, 673 (7th Cir. 1988)). Because the State cannot make the showing that the discovery it seeks is relevant, the Court should quash this Subpoena.

In the Underlying Litigation, there is only one issue in dispute: whether Idaho's Medicaid Policy and Idaho Code § 18-8901 and § 56-270, and HB 668, violate the constitution and/or Title XIX of the Social Security Act. *See* Ex. D. The Subpoena seeks information that has no relationship to Plaintiffs' claims. For example, the State seeks all internal WPATH communications, documents, and even recordings of WPATH 's scientific symposia, conferences, academic articles, and town halls. The State also seeks all communications and documents on broad topics such as gender transitions and treatments across various U.S. states and foreign countries, advertisements and news articles on gender-affirming

11

care, and the risks of transitioning – all of which could be found through publicly available sources.[6] This discovery is so unrelated to Plaintiffs' claims that the State has not and cannot meet the burden of showing relevance.

In addition to being irrelevant, the State also seeks all internal communications, including how WPATH's guidelines and studies were developed and who supported them, alleged disputes with former WPATH members, and random news articles criticizing WPATH, all of which is completely outside the scope of the dispute. WPATH's credibility is not at issue in the Underlying Litigation, but the State is seeking information that support little more than an attempt to disparage and discredit WPATH. The breadth of the Subpoena also suggests that the State is engaged in a thinly veiled retributive fishing expedition against a nonparty that happens to be ideologically aligned with the interests of the Plaintiffs. For example, the Subpoena seeks all information, communications, and documents related to articles, topics, and events in a multitude of U.S. states and foreign nations, none of which are connected to the constitutionality of the State's policies. Aligned interests do not create relevance, and the information sought is not only irrelevant to the dispute, but also either publicly available or likely in the possession of other non-parties, such as the non-WPATH authors and custodians of many of the articles and studies listed in the Subpoena.

E. **Enforcement of the Subpoena Would Impose Undue Burdens on WPATH.**

Per Rule 45, a subpoena must be quashed if it subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A)(iv). The party issuing the subpoena is responsible for avoiding imposing such a burden. Fed. R. Civ. P. 45(d)(1). An undue burden exists when complying with the subpoena would result in time,

---

[6] Even assuming arguendo that the content of the information sought by the State is relevant to questions of constitutionality, WPATH's articles and guidelines are publicly available, cite every study and piece of evidence on which they rely, and reflect the views of WPATH. These materials speak for themselves and are easily procurable. Ease of procurement alone is enough reason to quash. *See United States v. Tokash*, 282 F.3d 962, 971 (7th Cir. 2002) ("Second, the defendant must be unable through the exercise of due diligence to otherwise procure the documents reasonably in advance of trial."); *United States v. Nixon*, 418 U.S. 683, 699–700 (1974) ("[T]he moving party must show: . . . that [the documents] are not otherwise procurable reasonably in advance of trial by exercise of due diligence…").

expense, or collection efforts that outweigh any likely discovery benefit. Fed. R. Civ. P. 26(b)(1). Courts have "consistently held that 'non-party status' is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue." *United States v. Amerigroup Illinois, Inc.*, 2005 WL 3111972, at *4 (N.D. Ill. Oct. 21, 2005); *see also U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 694 (7th Cir. 2010) (stating that Rule 45(c) provisions suggest there should be "special attention to the procedural and substantive rights of the nonparty witness."). WPATH is a non-profit organization with a small staff and very few resources. *See* WPATH Decl. ¶¶ 4–5. And, as explained above, the requested discovery has nothing to do with disputed issues in the Underlying Litigation. Thus, compliance with the Subpoena would impose an undue burden.

### F. Good Cause Exists for the Timeliness of WPATH's Motion to Quash.

Courts have broad discretion over discovery and may grant an untimely motion to quash when there is an "adequate excuse." *See* Fed. R. Civ. P. 45(g). Untimely objections to a Rule 45 subpoena duces tecum "will not bar consideration." *Wade v. City of Fruitland*, 287 F.R.D. 638, 641 (D. Idaho 2013). Notably, good cause may be granted if "the subpoena is overbroad on its face, exceeds the bounds of fair discovery, or the subpoenaed witness is a non-party acting in good faith." *Id.* (citing *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal. 2005)). All three circumstances exist here: the Subpoena is overbroad on its face, it exceeds the bounds of fair discovery, and WPATH is a nonparty acting in good faith. Indeed, Subpoena is not only unfair, but as demonstrated above, it is illegal under Illinois law.

Counsel for WPATH was retained on October 9, after the Subpoena's initial compliance date. *See* Dailey Decl. ¶ 5. The State granted WPATH a short extension to produce documents responsive to the Subpoena. *Id.* During that time and since, WPATH has engaged in good faith negotiations with the State to resolve the Subpoena without motion practice, and during that time period, the short extension period passed. *Id.* Moreover, WPATH is a small non-profit organization that has made good faith efforts to resolve this Subpoena with the State to ensure that WPATH would not be subjected to unduly burdensome expenses and wasted time if forced to comply with this excessive and un-time bound Subpoena. *See*

13

*generally* WPATH Decl. For all these reasons, to the extent that WPATH's objections are determined to be untimely, good cause exists for this Court to quash the Subpoena.

## IV. CONCLUSION

For all the foregoing reasons, WPATH's Motion to Quash should be granted.

Dated this 22nd day of November, 2024.

CROWELL & MORING LLP

By: _____

Justin D. Kingsolver
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Telephone: 312-321-4200
jkingsolver@crowell.com

Derick D. Dailey
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: 212-224-4000
ddailey@crowell.com

*Counsel for WPATH*

14